BRENTWOOD ACADEMY

v.

TENNESSEE SECONDARY SCHOOL ATHLETIC ASSOCIATION, and Ronnie Carter, Executive Director and Individually

No. 3:97–1249.

United States District Court,
M.D. Tennessee,
Nashville Division.

Jan. 13, 2003.

H. Lee Barfield, James Franklin Blumstein, Nashville, TN, for plaintiff.

Richard Lee Colbert, Nashville, TN, for defendant.

## MEMORANDUM

CAMPBELL, District Judge.

### I. Introduction

Brentwood Academy has sued the Tennessee Secondary School Athletic Association ("TSSAA") and Ronnie Carter, TSSAA's Executive Director, alleging that the TSSAA Recruiting Rule, as written and applied, violates the First and Fourteenth Amendments and Tennessee law. The general background of this case is set forth in four reported opinions. *Brentwood Academy v. Tennessee Secondary Schools Athletic Ass'n.*, 13 F.Supp.2d 670 (M.D.Tenn.1998); *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 180 F.3d 758 (6th Cir.1999); *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001); and *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 262 F.3d 543 (6th Cir.2001). The Supreme Court held that the TSSAA is a "state actor" subject to the Constitution and 42 U.S.C. § 1983. The Court of Appeals for the Sixth Circuit then ruled that the Recruiting Rule "on its face" does not violate the First Amendment. The case was remanded for trial to determine if the Recruiting Rule "as applied" to Brentwood Academy violates the

First Amendment. Also to be tried were the following additional claims that were not determined by the Court of Appeals: Substantive Due Process, Procedural Due Process, Equal Protection, and Tennessee law.[1]

The Court held a ten day bench trial commencing December 11, 2002. For the reasons described herein, the Court finds that the Recruiting Rule, as applied to Brentwood Academy, is unconstitutional in violation of the First Amendment and the Fourteenth Amendment of the Constitution. The Court further finds that Brentwood Academy's right to due process under the Fourteenth Amendment was violated. Therefore, the August 23, 1997 penalties imposed by the TSSAA against Brentwood Academy are void and enjoined.

This does not mean that the TSSAA cannot or should not have a Recruiting Rule. The TSSAA has demonstrated that it has substantial governmental interests in having a Recruiting Rule. Brentwood Academy agrees that there should be a strong Recruiting Rule. In this case, however, the Recruiting Rule as applied to Brentwood Academy was not narrowly tailored to achieve the TSSAA's legitimate governmental interests. The Recruiting Rule also was applied without due process.

This Memorandum shall constitute the findings of fact, and conclusions of law, required by Fed.R.Civ.P. 52.

### II. Findings of Fact and Conclusions of Law

#### A. First Amendment—As Applied.

The Court of Appeals for the Sixth Circuit remanded this case to determine if the

---

1. Brentwood Academy also asserted various antitrust claims against the TSSAA. This Court, on remand, dismissed the antitrust claims against the TSSAA based on immunity because the TSSAA, for all practical purposes, is a subdivision of the state regarding its regulatory activity over interscholastic athletics. (Order, Docket No. 254).

Recruiting Rule is narrowly tailored to meet the TSSAA's alleged substantial governmental interests as applied to Brentwood Academy. *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n,* 262 F.3d 543 (6th Cir.2001). The TSSAA has the burden of establishing (1) the legitimacy of its alleged substantial governmental interests and (2) that the Recruiting Rule as applied to Brentwood Academy is narrowly tailored to further these governmental interests. *Id.*

The Sixth Circuit held that the Recruiting Rule is a content-neutral regulation subject to intermediate scrutiny for purposes of the First Amendment. The Sixth Circuit also ruled that the Recruiting Rule is not facially overbroad in violation of the First Amendment. The Recruiting Rule, being content-neutral and subject to intermediate scrutiny, must be narrowly tailored to serve substantial governmental interests. The Recruiting Rule does not need to be the least restrictive alternative, but it cannot unreasonably limit alternative avenues of communication under the First Amendment. *Id.*[2]

The TSSAA has asserted three governmental interests to justify the Recruiting Rule: (1) to keep high school athletics in their proper place subordinate to academics; (2) to protect student athletes from exploitation; and (3) to foster a level playing field between schools for competitive equity. The first interest—keeping athletics in their proper place subordinate to academics—has already been established. *Id.*

The Recruiting Rule in dispute is a one paragraph provision contained in Section 21 of the TSSAA's Bylaws:

Recruiting Rule

Section 21. The use of undue influence on a student (with or without an athletic record), the parents or guardians of a student by any person connected, or not connected, with the school to secure or to retain a student for athletic purposes shall be a violation of the recruiting rule.

(Plaintiff's Exhibit 63; Defendant's Exhibit 68).

Following the Recruiting Rule is interpretive commentary divided into Questions and Answers and "Guidelines":

1.

Q. How is undue influence interpreted in the recruiting rule?

A. A person or persons exceeding what is appropriate or normal and offering an incentive or inducement to a student with or without an athletic record.

2.

Q. What is the penalty for violation of the recruiting rule?

A. Violation of the recruiting rule shall cause the student to be ineligible at the school in violation, and a penalty shall be placed against the school.

3.

Q. Is it permissible for a coach to contact a student or his or her parents prior to his enrollment in the school?

A. No, a coach may not contact a student or his or her parents prior to his enrollment in the school. This shall apply to all students whether or not they have an athletic record.

2. Defendants suggest that the speech at issue in this case is not a matter of "public concern." The Court finds, and the Sixth Circuit has already determined, that under the content-neutral, intermediate scrutiny standard, the substantial governmental interests of the TSSAA by definition implicate speech that is a matter of "public concern" for purposes of the First Amendment. *Id.* The Sixth Circuit also held in this case that "commercial speech analysis" does not apply. *Id.* at 555.

**4.**

Q. What are some of the guides used in determining whether there has been undue influence used which would result in a violation of the recruiting rule?

A. Some examples are, but not limited to:

1. Providing of transportation or other inducement to any prospective student/athlete to take a qualifying examination at a school, meet with school officials, etc.

2. Discussion of financial aid based on need with any prospective student/athlete by any member of the coaching staff until the student has enrolled in school (attended 3 days of school). All financial aid questions should be referred to the principal or the person in charge of financial aid. If the person in charge of financial aid is a coach, prior approval must be granted by the Executive Director of TSSAA.

3. Any initial contact or prearranged contact by a member of the coaching staff or representative of the school and a prospective student/athlete enrolled in any member school except where there is a definite feeder pattern.

4. Any initial contact or prearranged contact by a member of the coaching staff or representative of the school and a prospective student/athlete in the seventh grade and above at any non-member school except where there is a definite feeder pattern involving the schools.

Public high schools may contact public feeder schools (elementary, middle school, junior high school) where there is a definite feeder pattern. Private or parochial schools may contact private schools (elementary, middle school, junior high school) where there is a definite feeder pattern.

Private or parochial schools may not contact students enrolled at the public schools. Public schools may not contact students enrolled at the private schools.

5. Any contact between a member of the coaching staff or representative of the school and prospective student/athletes prior to, during, or after contests at elementary schools, middle schools, and junior high schools except where there is a definite pattern.

6. A member school is prohibited from giving any item with school advertisement (shirts, pennants, caps, jackets, etc.).

7. Admitting students to athletic contests free of charge where there is an admission being charged at the contest except where there is a definite feeder pattern involved with the school.

**5.**

Q. What is allowed by member schools in contacting prospective students?

A. A representative of the school may meet with students at a school that is defined as a feeder school or meet with students who are zoned to attend that school the following year. This visit must be cleared by the principals of both schools.

Guidelines for Understanding The "Recruiting Rule" and Understanding "What Is Undue Influence?"

1. The major theme of the "recruiting rule" is not "initial contact." The major theme is "exceeding what is normal and appropriate." Initial contact can be a violation, but is only one of many things that can exceed what is normal and appropriate.

2. One key is not treating "athletes" or "prospective athletes" any differently than students who are not athletes.

3. Students should be seen as students and not singled out based on their potential athletic ability.

4. Pre-arranged contact is seen in the same manner as initial contact.

5. Any student or family or individual that contacts a coach about attending a school where he or she coaches should be informed that they need to contact the principal, admissions department, or guidance department if they have an interest.

6. Any meeting with coaches regarding athletes or prospective athletes or their families should be at the request of the family to the individual(s) responsible for admissions and should take ·place at the school.

7. High school athletics is not the same as colleges recruiting high school athletes for college athletics. High school athletics exist for an entirely different reason. High school coaches should not view 12–, 13–, 14–year old students in the same manner as college coaches view high school seniors.

8. Administrators and coaches must realize that they have more responsibilities than the general public to understanding the purpose of high school athletics, the principles behind the TSSAA rules, etc., and to maintain a level of understanding and purpose when dealing with the general public and students.

*Id.* The TSSAA testified, through Ronnie Carter and members of the Board of Control, that the interpretive commentary is not a binding interpretation of the Recruiting Rule and that the Executive Director and the Board of Control have the discretion to disregard the interpretive commentary.

The TSSAA contends that the term "enrolled" used in the Recruiting Rule is defined in its Bylaws at Article II (Eligibility Rules), Section 1 (Academic Rules) as follows:

Academic Rules

Section 1. To be eligible to participate in athletic contests during any semester:

. . . .

(b) Students shall be regularly enrolled, in regular attendance, and carrying at least five full courses. A student shall be considered as regularly enrolled after the student has attended for three days, has engaged in three or more days of football, girls volleyball, cross country, golf or girls soccer practice during the period on or after August 1, or has participated in an athletic contest in any sport.

(Defendant's Exhibit 68). Plaintiff denies that this definition of "enrolled" applies to the Recruiting Rule.

The TSSAA found, among other things, that a Spring Practice Letter (Plaintiff's Exhibit 8) sent by Brentwood Academy to all incoming ninth grade male students, whose parents had signed enrollment contracts, violated the Recruiting Rule. It is undisputed that each of the twelve students who received the Spring Practice Letter previously had applied, been tested and admitted, and signed an enrollment contract with Brentwood Academy. In addition, all the students not applying for financial aid had paid a $300 deposit to the school. It is also undisputed that the letter went to all incoming male students, not just student athletes.

The Spring Practice Letter states:

## BRENTWOOD ACADEMY

219 Granny White Pike 
(615) 377–3632

Brentwood, Tennessee 37027 
fax: (615) 377–3709

Athletic Director: Carlton Flatt Asst. Athletic Director: Buddy Alexander

April 23, 1997

Having officially enrolled at Brentwood Academy, the TSSAA allows you to participate in spring football practice. If you are not currently involved in a sport at your school, we would like to invite you to practice with your new team. Equipment will be given out April 30th at 3:30 downstairs in the locker room.

*Spring practice will begin May 1, 1997 and conclude on May 14, 1997.* Practice begins at 3:20 and will be finished by 4:45. Due to the inconvenience to your parents, please do not feel that you must attend every practice. However, I do feel that getting involved as soon as possible would definitely be to your advantage.

In the near future, you will receive a letter outlining our summer workout program. If you have any questions, please call me at school 373–0611 × 119, or at home 373–0475. We are certainly glad that you decided to become an Eagle.

Your Coach,

Carlton Flatt

*Id.* The TSSAA also found that certain follow-up telephone calls by Carlton Flatt about the Spring Practice Letter violated the Recruiting Rule.

On July 29, 1997, Defendant Ronnie Carter, the Executive Director of the TSSAA, determined that Brentwood Academy violated the Recruiting Rule and imposed penalties that were effective immediately. (Plaintiff's Exhibit 86). Brentwood Academy filed an appeal which was heard by Carter along with three members of the Board of Control: Mike Hammond, Morris Rogers, and Mickey Dunn. Brentwood Academy made a presentation at this appeal hearing, but the TSSAA presented no evidence. On August 14, 1997, Carter, with the advice and consensus of the three members of the Board of Control, again found Brentwood Academy in violation of the Recruiting Rule and imposed revised penalties. (Plaintiff's Exhibit 87). Carter testified at trial that the three Board of Control members were merely advisors, but two of the members of the Board of Control (Morris Rogers and Mickey Dunn) testified that they believed they were decision-makers, rather than advisors to Carter at this hearing.

Brentwood Academy then filed a final appeal to the entire Board of Control. The Board of Control consisted of nine members, including the three members who participated in the prior decision that was the subject of the appeal. Again, Brentwood Academy made a presentation to the Board of Control at a public hearing, and the TSSAA presented no evidence. Following the presentation by Brentwood Academy, the Board of Control deliberated in private "executive session." The credible evidence at trial establishes that during the private deliberations, Carter and the two TSSAA employees who had investigated the case—Gene Menees and Bernard Childress—answered questions from the Board of Control. Brentwood Academy was excluded from the deliberations.

On August 23, 1997, the Board of Control found that Brentwood Academy had violated the Recruiting Rule and imposed new penalties. The Board of Control's ruling provides as follows:

This letter is in response to your appeal before the Board of Control at the Sheraton Music City on Aug. 23, 1997.

First, on behalf of the entire Board I commend you and those who appeared on behalf of your school as they delivered information to us. Our Board took time to thoroughly review all the information that was presented today and that had been previously submitted to the state office.

After reviewing and having a detailed discussion on all of the information, the Board's determination is that the following violations of TSSAA regulations occurred:

1. Student-athletes have been admitted free of charge to athletic contests.

2. Contact with student-athletes, initiated by Brentwood Academy, while those students were enrolled at other schools.

3. Brentwood Academy coaches conducting impermissible off-season practice with Brentwood Academy student-athletes.

The details of each of the foregoing violations have been described in previous correspondence from TSSAA Executive Director Ronnie Carter. In order to communicate the decision of the Board of Control to you as soon as possible, I will not take the time to reiterate the factual details of the foregoing violations.

The Board of Control has determined that the appropriate penalty for the foregoing violations are as follows:

1. The entire athletic program of Brentwood Academy will be on probation for four years. If there are further violations during the probationary period, TSSAA will have no choice but to take further disciplinary action.

2. Brentwood Academy's football and boys' basketball programs are suspended from the TSSAA playoff series for the 1997–98 and 1998–99 school years.

3. Brentwood Academy is fined $3,000 for the above violations.

4. The Brentwood Academy football and boys' basketball programs will not be permitted to engage in off-season practice in the 1997–98 and 1998–99 school years.

5. Appropriate administrative officials of Brentwood Academy will meet with the TSSAA Executive Director to develop an administrative control plan to help guard against future problems like those which precipitated this action.

The portion of the previous penalty pertaining to tournament series revenue has been removed. In addition, the Board of Control has decided that no student-athletes should be declared ineligible based on the foregoing violations provided they meet all other eligibility requirements.

Notwithstanding the modifications of the previous penalties by the Board of Control, the foregoing violations are serious. While there is no indication of a deliberate intent to violate TSSAA rules by Brentwood Academy officials, the Board of Control concurs with the Executive Director's concern about a lack of appropriate administrative control in various aspects of the school's athletic program. These concerns will have to be addressed in the administrative control plan to be developed.

(Plaintiff's Exhibit 88).[3]

Testifying before this Court, Carlton Flatt, Athletic Director and Football Coach of Brentwood Academy, stated that

---

3. The TSSAA's finding of a violation of the off-season practice rule is not contested by the parties.

the Spring Practice Letter went to all incoming ninth grade male students who had applied, been tested and admitted, and signed enrollment contracts with Brentwood Academy. This is undisputed. One student (Jacques Curry) who had been accepted by Brentwood Academy, but had not signed an enrollment contract, was not sent the Spring Practice Letter. Approximately 95% of the students who sign enrollment contracts in the spring attend in the fall, according to Flatt. The Spring Practice Letter was sent to all incoming ninth grade male students to avoid singling out any students, particularly Ray Marley, who had been cleared by Ronnie Carter to lift weights at Brentwood Academy even though he was a student at Grassland Middle School. It is also undisputed, and admitted by Ronnie Carter, that participation at spring football practice by the incoming Brentwood Academy students was permissible under the TSSAA rules.

Flatt further testified that after the Spring Practice Letter was mailed, he got a "couple of calls" from parents regarding attendance. In order to make sure all parents knew that spring practice was optional, Flatt made follow-up telephone calls to that effect. Flatt received no complaints from parents about the Spring Practice Letter or calls. Flatt did not consider the Spring Practice Letter to be "recruiting" because the recipients of the letter had already completed the enrollment process and thereby indicated that they were coming to school at Brentwood Academy.

Elizabeth Tate, current Admissions Director for Brentwood Academy, testified about the enrollment process used at the school. Tate also testified that independent schools by their nature must recruit students and must take every opportunity to "tell their story" to prospective and incoming parents and students.

Ellen Goldring, a Peabody Professor and "school choice" expert, testified for Plaintiff. Goldring stressed the importance of schools providing information to parents in order for parents to make informed school choices. She further testified that the TSSAA's Recruiting Rule is educationally outdated because of the growth of school choice options. Beyond zoned public schools and independent schools, current school choice offerings include magnet schools; charter schools; liberal transfer policies among public schools based on curricula; open enrollment; and transfer from low performing public schools pursuant to the new "No Child Left Behind" federal law. Independent school choices include religious schools, single gender schools, and boarding schools. Various types of specialized magnet schools (*e.g.*, math, science, arts, and literature) are available. Charter schools will begin to operate in Tennessee this fall. Home schooling is also an option.

Goldring testified that the flow of information from schools to parents, as decision-makers, is very important to making informed school choices about both where to attend and the options available at the school that is ultimately selected. According to Goldring, the government should not be in the business of protecting specific schools from choices by parents. Goldring sees no harm in school-initiated targeted information to parents. The Recruiting Rule is inconsistent with informed school choice, according to Goldring.

Goldring opined that preventing exploitation is a significant governmental interest. She stated, however, that the Spring Practice Letter and follow-up calls were merely the free flow of harmless information and not exploitive. Goldring saw no reason to distinguish between information that can be provided by a school to parents inside a feeder pattern from information

that can be provided by a school to parents outside a feeder pattern. The Spring Practice Letter, according to Goldring, does not harm a "level playing field."

Nancy Brasher, the Admissions Director for Brentwood Academy at the time of the events in question, testified consistent with Carlton Flatt about the particulars of the mailing of the Spring Practice Letter. Brasher actually mailed the Spring Practice Letter to all new, incoming ninth grade male students who had completed the enrollment process. Carlton Flatt did not have the students' names.

Brasher also testified about the overall enrollment process at Brentwood Academy. Once an enrollment contract is signed, incoming students get all mailings that all other Brentwood Academy students receive in order to integrate the new students into the school. Brasher stressed the need for the school to communicate with its incoming students for the well-being of the students. Brasher does not believe that the Spring Practice Letter was exploitive or harmful in any respect. Last year, only 8 of 700 students who signed enrollment contracts in the spring did not attend in the fall, according to Brasher.

John Slaughter, father of a Brentwood Academy student who received the Spring Practice Letter, stated that the Spring Practice Letter was not harmful or exploitive. Slaughter testified that "we recruited Brentwood Academy," not vice versa. Joe Marley, Grassland Middle School Football Coach and father of another Brentwood Academy student, Ray Marley, who received the Spring Practice Letter, testified that the Spring Practice Letter was not inappropriate and that his son was already planning to attend spring practice. Both Slaughter and Marley stated that upon signing the Brentwood Academy enrollment contract, their school choice was final. Marley testified how the "feeder

school" exception actually works in practice at public schools.

George Pitts, former public school coach (Science Hill) and current Brentwood Academy Basketball Coach, testified about how public high school coaches typically contact public middle school students in their feeder pattern under the Recruiting Rule. Pitts, in particular, testified about initial contact by coaches. Board of Control members Mike Hammond, Mickey Dunn and Morris Rogers testified similarly about the existence of the "feeder pattern" exception and how it works with public schools.

Ellis Haguewood, Headmaster of Memphis University School, testified about the importance of private schools communicating with students who have signed enrollment contracts. Haguewood had no reservations about the Spring Practice Letter or follow-up calls. He stressed that private schools see enrollment and matriculation differently. Haguewood testified that the TSSAA's definition of enrollment (attendance for three days) is a public school definition unworkable for private schools.

Milbrey Ganick, mother of a Brentwood Academy student who received the Spring Practice Letter, testified that the Spring Practice Letter was not coercive, threatening, or harassing. She called Carlton Flatt to confirm that participation was optional. Her son, Chandler Ganick, a Brentwood Academy student, testified that the Spring Practice Letter was just a harmless form letter. It did not influence his decision to attend Brentwood Academy, because he was already planning to attend.

Harry Allan, another Brentwood Academy parent, was "thrilled" to get the Spring Practice Letter. Allan did not consider the Spring Practice Letter inappropriate or harmful and it did not influence him to send his child to Brentwood Academy, since that decision was made upon signing

the enrollment contract. Allan considered the Spring Practice Letter a standard form letter. He was "excited" to get the letter and was "desperate" to get information about the various programs at the school.

Michael Obel–Omia, Admissions Director at the Roxbury Latin School in Massachusetts, testified as an expert witness for the Plaintiff. Obel–Omia stressed the importance of private schools reaching out in targeted ways to recruit students, particularly to achieve diversity. Obel–Omia saw nothing inappropriate or harmful about the Spring Practice Letter or calls.

Jim Guthrie testified as an education expert for Plaintiff. Guthrie's testimony was consistent with Goldring's. Guthrie stressed the need for schools to provide parents with information to make informed school choices about what school to attend and the options available at the school selected. Guthrie opined that the Recruiting Rule is not consistent with the modern imperatives of education. Guthrie did not perceive the Spring Practice Letter or follow-up calls as exploitive. Guthrie opined that prevention of exploitation is a substantial governmental interest as it relates to misleading, harassing, or coercing conduct.

The testimony of Hulon Watson, Superintendent of Rutherford County Schools and former Riverdale High School Principal, exemplified the hostility between public schools and private schools regarding athletics. Watson testified that Defendant Ronnie Carter was aware of the general hostility and suspicion of public schools toward private schools regarding athletics, which eventually resulted in a split into two divisions for certain TSSAA playoffs. Watson was a motivating force for the split.

Watson also testified about how the "feeder pattern" exception works in practice at public schools. The football coach of Riverdale High School sent incoming students within its feeder pattern a summer practice "Warrior" letter (Plaintiff's Exhibit 104) substantially similar to the Spring Practice Letter. Watson testified that the "Warrior" letter was "appropriate and normal" and not "undue influence." Bernard Childress, Assistant Athletic Director of the TSSAA, however, testified that the "Warrior" letter violated the Recruiting Rule. Mike Reed, President of the Board of Control, on the other hand, testified that the "Warrior" letter was not a problem.

Otis Cosby, father of another Brentwood Academy student who received the Spring Practice Letter, testified that he was pleased to get the Spring Practice Letter and that he did not consider it harmful. Cosby further testified that the decision to send his son to Brentwood Academy was made at the time he signed the enrollment contract.

Defendant Ronnie Carter, the Executive Director of the TSSAA, testified that the Spring Practice Letter and follow-up calls were harmful undue influence because of their contents: the letter came from a famous coach; the letter assumed an incorrect definition of "enrollment"; Brentwood Academy was not the student's new team yet; the phrase "if you are not currently involved in a sport" places undue emphasis on sports to the exclusion of other things; the phrase "inconvenience to your parents" does not consider inconvenience to the student; the phrase "definitely be to your advantage" really means practice is not an option; the coach's home number is included; and the reference to becoming an "Eagle" is inappropriate since the student is not yet attending the school.[4] Carter testified that participation

4. The Court finds that the preponderance of the credible evidence at trial is that the sub-

in spring practice did not violate the Recruiting Rule.

Carter testified that preventing "exploitation" is the "fundamental" purpose of the Recruiting Rule. He stated that competitive equity is also a purpose of the Recruiting Rule. Carter stated that the definition of enrollment applied in the Recruiting Rule by the TSSAA is "tied to eligibility" for participation. (Defendants' Exhibit 68, pp. 28–29). The Board of Control is the "final authority" on interpreting the Recruiting Rule, but it delegates interpretive authority to the Executive Director.

Carter further testified that the interpretive commentary to the Recruiting Rule is not a binding interpretation of the Recruiting Rule and that he, the Executive Director, and the Board of Control, both have the discretion to disregard the interpretive commentary. He stated that he does not "look at feeder patterns" to determine "undue influence" Recruiting Rule violations. "Singling out" a student-athlete is what "school people" understand is prohibited by the Recruiting Rule, Carter said.

Carter testified that Brentwood Academy violated TSSAA "institutional control" requirements, but he admitted that "institutional control" is not mentioned in the TSSAA Bylaws. Carter stated there can be a violation of the Recruiting Rule without an "intent" to violate.[5] Approximately 82,000 student-athletes and 370 schools, including about 50 private schools, participate in the TSSAA. No official of the State of Tennessee has directed or ordered the TSSAA in any way concerning the Recruiting Rule or the interpretive commentary, or identified the governmental interests to be protected by the Recruiting Rule.[6] The TSSAA has not done any studies on the harm of recruiting. Carter stated that the absence of any Recruiting Rule would result in a "war zone" and coaches' resignations. He stated that "the rich would get richer real quick" if there is no prohibition on recruiting.

Curtis Masters, who became Headmaster of Brentwood Academy in July, 2002, testified that Brentwood Academy wants a strong TSSAA Recruiting Rule. He stated, however, that the Recruiting Rule needs to be clear, applied equally, and allow Brentwood Academy to "tell its story" to prospective and incoming students.

Sharon Kay Stoll, a professor in sports ethics, testified as an expert witness for Defendants. Stoll opined that a Recruiting Rule is necessary to have a level playing field and to eliminate the "specialness" of athletics. She stated that a Recruiting Rule promotes a level playing field because it gives an equal opportunity to compete. A Recruiting Rule also enhances the totality of the school experience by not placing too much recognition on athletes. Stoll opined that the Spring Practice Letter is benign outside the sports world, but inside the sports world it is harmful because it makes athletes something special. Stoll evaluated the content of the Spring Practice Letter as harmful, consistent with Ronnie Carter's testimony. Stoll's posi-

---

5. Carter failed to explain how he could determine whether influence was "for athletic purposes" without considering intent.

6. Pursuant to Tenn.Code Ann. §§ 8–6–109 and 8–6–110, and 28 U.S.C. § 2403, the Attorney General of Tennessee was advised of this case. The Attorney General did not file a motion to intervene. (Order, Docket No. 251).

stantive "content" of the Spring Practice Letter and calls mattered and was a significant factor in the TSSAA's decision that the letter and calls constituted "undue influence" and violated the Recruiting Rule. The TSSAA penalized Brentwood Academy for the substantive "content" of the Spring Practice Letter and calls and the message they conveyed in this case.

tion is that all athletic recruiting should be prohibited.

Jack Roberts, the Executive Director of the Michigan equivalent of the TSSAA, also testified as an expert witness for Defendants. Roberts opined that a Recruiting Rule is necessary to prevent exploitation and to maintain a level playing field for competitive equity. Roberts used the NCAA as a model for a place state high school athletic associations "don't want to go" because of the complexity of its Recruiting Rule. Roberts testified that sports has too large a role in American life and that professional sports is an unrealistic goal for high school athletes. He stated that a Recruiting Rule is necessary for a level playing field because losing games all the time diminishes the students' willingness to compete, and recruiting creates an "arms race" among schools. Roberts opined that the content of the Spring Practice Letter and follow-up telephone calls was harmful for the same reasons stated by Ronnie Carter in his testimony. Roberts opined that there should be no recruiting for athletic purposes or targeted communication for athletics.

George Sage, a professor emeritus in the sociology of sports, testified as an expert witness for Defendant. He opined, like the Defendants' other experts, that a Recruiting Rule is necessary to prevent exploitation and to foster a level playing field for competitive equity. Sage also gave a brief history of sports in America. Sage cautioned not to "open the door" to recruiting as the NCAA has. Sage evaluated the content of the Spring Practice Letter and follow-up calls as harmful on the same basis as Ronnie Carter in his testimony.

Charles Thomas McMillen, a former star basketball player and Congressman, and a lifelong student of sports, testified as an expert witness for Defendant. McMillen opined that the NCAA Recruiting Rule is a guide for what type of rule should be avoided. McMillen stated that the Spring Practice Letter and calls were harmful both to parents and students. McMillen evaluated the content of the Spring Practice Letter as harmful, consistent with Ronnie Carter's testimony. McMillen opined that recruiting "warps the value systems" of students; creates an unhealthy "subculture;" produces adverse health consequences; leads to commercialization; and provides no benefits. McMillen, who is not a lawyer, opined that schools should be required to give up free speech rights just as he believes government contractors do. McMillen's position is that all athletic recruiting should be prohibited.

Glen McCadams, Dean of Students and Football Coach for David Lipscomb, a private religious school, testified in favor of a strong recruiting rule. McCadams also testified about how the "feeder pattern" exception works to allow feeder school coaches to recruit middle school students. He stated that the TSSAA is a "club of schools."

Austin Clark, Athletic Director and Basketball Coach for Baylor private boarding school in Chattanooga, testified for Defendants. The Recruiting Rule is important because "only the haves will have" if recruiting is permitted, according to Clark. He opined that athletic recruiting has no place in high school sports. Clark also stated that the Recruiting Rule is difficult to follow.

Barbara Daush, the President of St. Agnes Academy, a private religious school in Memphis and ex officio member of the Board of Control, testified that the Recruiting Rule is necessary to prevent the exploitation of students.

Bill Brown, former Headmaster of Brentwood Academy at the time of the events in question, testified that Brentwood Academy signed contracts each year

to be a TSSAA member and to comply with TSSAA Rules. Brown testified that it is critical for the school to contact its students after their parents sign enrollment contracts to get the students acclimated to the school. Brown also stated that, at times, students who sign enrollment contracts with Brentwood Academy do not ultimately attend for various reasons. Brown testified that fair competition is an important goal of the TSSAA. According to Brown, the TSSAA and its Bylaws are dominated and controlled by public school interests.

Bill Brown further testified that no athletic recruiting should be permitted "period." He stated that Brentwood Academy, prior to the appeals, knew the general charges by the TSSAA but not the sources or details of the charges. According to Brown, the appeal hearings were not "fair." Brown stated that this lawsuit was brought to clear Brentwood Academy's name and to allow Brentwood Academy to tell its mission story to prospective and incoming families without violating the Recruiting Rule.

### 1. *Governmental Interests*

This case involves the intersection of the First Amendment, education and athletics.

This Court previously found that the TSSAA has a substantial governmental interest in keeping high school athletics "in their proper place" subordinate to academics. This finding was affirmed by the Court of Appeals on cross-motions for summary judgment. Now, after a more fully developed record at trial, this Court reconfirms this finding of fact and conclusion of law.

The Court also finds as a matter of fact, and concludes as a matter of law, that the TSSAA has a substantial governmental in-

terest in protecting student athletes from "exploitation." The parties disagree about what constitutes "exploitation."

The Court further finds as a matter of fact, and concludes as a matter of law, that the TSSAA has a governmental interest in fostering a "level playing field" between schools for "competitive equity," but this interest is less significant than the TSSAA's substantial interests in subordinating athletics to academics and preventing exploitation. The TSSAA does not have a substantial governmental interest in preventing or discouraging students from moving from one school to another for academic or educational purposes, in whole or in part, in order to foster competitive equity in athletic contests. The substantial governmental interest in informed school choice trumps any governmental interest in controlling which schools or teams win athletic contests.[7] Academics are more important than athletics.

The First Amendment question thus becomes whether the Recruiting Rule, as applied to Brentwood Academy, is narrowly tailored to further the three identified governmental interests.

### 2. *Not Narrowly Tailored*

■ The TSSAA found Brentwood Academy violated the Recruiting Rule by "[c]ontact with student-athletes, initiated by Brentwood Academy, while these students were enrolled at other schools." (Plaintiff's Exhibit 88). The Recruiting Rule, which prohibits "undue influence" for athletic purposes, does not expressly prohibit such "contact." The "contact" violation is based on Question 3 (no coach "contact"), and Question 4, Examples 3 ("no initial contact"), and 4 ("private . . . schools may not contact students enrolled

---

7. Board of Control member Morris Rogers also testified in deposition that a purpose of the Recruiting Rule was to protect schools

and coaches from other schools taking their students. This is not a legitimate governmental interest in this case.

at the public schools"), and Question 1 ("exceeding what is appropriate and normal") of the interpretive commentary. (Plaintiff's Exhibit 63). ("The details of each of the foregoing violations have been described in previous correspondence from TSSAA Executive Director Ronnie Carter," Plaintiff's Exhibit 88; *see* the July 29, 1997 (Plaintiff's Exhibit 86) and August 14, 1997 (Plaintiff's Exhibit 87) letters of the TSSAA regarding violations.)

For the reasons described herein, the Court finds, as a matter of fact, and concludes as a matter of law, that the Recruiting Rule (Article II, Section 21, Plaintiff's Exhibit 63) is not narrowly tailored to further any of the three governmental interests of the TSSAA as applied to Brentwood Academy. Inclusion of the interpretive commentary does not save the Recruiting Rule.[8] The Court further finds as a matter of fact, and concludes as a matter of law, that the interpretive commentary (*e.g.*, Questions 1 and 3 and Question 4, Examples 3 and 4) does not make the Recruiting Rule narrowly tailored to further any of the three governmental interests of the TSSAA as the Recruiting Rule was applied to Brentwood Academy in this case. The Recruiting Rule, therefore, is unconstitutional as applied to Brentwood Academy based on the facts in this case.

The Court finds that the Spring Practice Letter (Plaintiff's Exhibit 8) and the follow-up telephone calls are consistent with and do not violate the TSSAA's legitimate governmental interests. The Spring Practice Letter and calls caused no actual harm and did not reasonably threaten harm to students, parents, or any legitimate governmental interests. The Spring Practice Letter and calls simply were harmless informational speech about a permitted athletic practice from a private school to all the parents of all the male students who had applied, been tested and admitted, and signed enrollment contracts, students who had already decided to attend Brentwood Academy. The Spring Practice Letter and calls did not "single out" students since they went to all the families of all the male students who had completed the enrollment process.[9] The Spring Practice Letter and calls were "appropriate" and "normal" speech for a school and they did not constitute "undue influence." They are an example of "due," rather than "undue," influence, as testified by the parents of these students.

The Spring Practice Letter and calls did not elevate athletics over academics. Neither students nor parents were exploited in theory or in fact. Nothing in the communications from Brentwood Academy to the parents of incoming students violated competitive equity, since the athletic practice at issue was clearly permitted by the TSSAA. Neither the content of the Spring Practice Letter or calls, nor the act of a coach contacting parents and students about spring practice, was adverse to the TSSAA's legitimate governmental interests.

The failure of the TSSAA to narrowly tailor the Recruiting Rule, as applied in this case, is made further evident by the "feeder pattern" exceptions that exist in the interpretive commentary to the Recruiting Rule. As applied in this case, there is no legitimate reason to permit speech in

8. For instance, Ronnie Carter and members of the Board of Control testified that the interpretive commentary to the Recruiting Rule is not binding and that the Executive Director and the Board of Control have the discretion to disregard the interpretive commentary and have done so.

9. Certain statements made by Board of Control members and some of Defendants' experts demonstrate a misunderstanding of this undisputed fact.

a feeder pattern but prohibit the same speech by Brentwood Academy to its incoming students.[10] Various witnesses testified about how the "feeder pattern" exception for public schools is actually used to broadly permit the type of speech for which Brentwood Academy has been sanctioned by the TSSAA. The bottom line is that schools in a "feeder pattern" can make certain school-initiated, targeted speech that schools, such as Brentwood Academy, outside the "feeder pattern," cannot make. The Recruiting Rule, therefore, is under-inclusive of speech as applied to Brentwood Academy.

The Court further finds, and concludes as a matter of law, that the TSSAA broadly and unconstitutionally applied the Recruiting Rule to Brentwood Academy over what is essentially *post*-recruiting activity. This is especially troublesome. The parents and students who received the Spring Practice Letter and calls had already completed any "recruiting" process since the students had applied, been tested and admitted, and signed enrollment contracts. The TSSAA did not have a substantial governmental interest in regulating this *post*-recruiting speech by Brentwood Academy to these students who had completed the enrollment process in this case. This *post*-recruiting application of the Recruiting Rule to Brentwood Academy was not narrowly tailored to further any legitimate governmental interests of the TSSAA.[11] The *post*-recruiting application of the Recruiting Rule to Brentwood Academy also was not a narrowly tailored time, place, and manner restriction on Brentwood Academy's constitutional right to speak.[12]

The Defendants contest whether the Brentwood Academy enrollment contracts were binding as a matter of Tennessee contract law.[13] For purposes of the First Amendment, however, this contract issue is not outcome determinative. By the point at which the parents signed the enrollment contracts, the balance of constitutional interests tipped in favor of Brentwood Academy being able to communicate with the incoming students, whether or not the students somehow might wiggle out of their contracts, and weighed against the TSSAA's legitimate governmental interests. Brentwood Academy had a substan-

10. The Court finds as a matter of fact, and concludes as a matter of law, that "feeder pattern" exceptions to the Recruiting Rule exist and have been applied by the TSSAA. *See, e.g.,* Recruiting Rule, Question 4, Examples 3, 4, and 5. The preponderance of the credible testimony is that the "feeder pattern" exceptions have long existed and have been applied by the TSSAA and relied upon by member schools. (*See* testimony of Board of Control members Mike Reed, Mike Hammond, and Mickey Dunn regarding their understanding of the "feeder pattern" exception; and testimony of George Pitts, Joe Marley, John Slaughter, and Harry Allan as to actual incidents of contact within the "feeder pattern.") The Sixth Circuit has also recognized the "feeder-school exemption" and that Brentwood Academy has no "feeder pattern with any school." 262 F.3d at 548.

11. The fact that the Recruiting Rule expressly applies "to retain" as well as "to secure" students for athletic purposes does not alter the balance of constitutional interests as applied to Brentwood Academy. On the facts of this case, the TSSAA had no narrowly tailored legitimate governmental interest in preventing or discouraging speech by Brentwood Academy to "retain" these students who had completed the enrollment process.

12. Additionally, the *post*-recruiting application of the Recruiting Rule was not narrowly tailored to control any "secondary effects" of Brentwood Academy's speech in this case. Also, the application of the Recruiting Rule to Brentwood Academy in this case is with reference to the content of the speech and the impact of the speech.

13. The Sixth Circuit has already recognized in this case that the students at issue had "contractually agreed to attend" Brentwood Academy. 262 F.3d at 548.

tial and superior constitutionally protected First Amendment interest in communicating with the incoming students about all aspects of the school, including sports, so that the parents and students could make informed choices about education.

Defendants stress that Brentwood Academy "voluntarily" signed contracts wherein the school agreed to comply with TSSAA Rules. However, the Sixth Circuit has already held in this case that Brentwood Academy "has not waived its right to challenge the constitutionality of the recruiting rule by voluntarily joining TSSAA." 262 F.3d at 551.

The Defendants' suggestion that Brentwood Academy should either leave the TSSAA or change the TSSAA rules does not remedy the constitutional violation. The TSSAA is effectively the only game in town for the same reasons the TSSAA is a state actor. Also, the amendment of the Recruiting Rule or the definition of "enrolled" is not within the control of Brentwood Academy. Neither Brentwood Academy nor any private school was on the Legislative Council at the time in question. In any event, and as the Sixth Circuit has already held in this case, Brentwood Academy cannot be forced to waive its First Amendment rights. *Id.*

The Recruiting Rule, as applied to Brentwood Academy, also unreasonably prohibited avenues of communication—one form letter and one follow-up call—that were not intrinsically coercive, threatening, harassing, or otherwise harmful.[14] The face-to-face communication permitted and practiced in the "feeder patterns" has a greater potential for "undue influence" and exploitation than the Spring Practice Letter and calls.

Finally, the Court further finds as a matter of fact, and concludes as a matter of law, that the punishment exacted for the alleged violations by Brentwood Academy relating to the Spring Practice Letter and follow-up calls was not appropriate regulatory action narrowly tailored to further the governmental interests of the TSSAA as a state actor for the above reasons.

In summary, for purposes of the First Amendment, the Recruiting Rule "as applied" to Brentwood Academy in this case is unconstitutional.[15] The Recruiting Rule is not narrowly tailored to achieve the legitimate governmental interests of the TSSAA as applied to Brentwood Academy based on the facts in this case. Judgment shall enter for Brentwood Academy against the TSSAA on the First Amendment "as applied" claim.[16]

**14.** In contrast, the TSSAA permitted face-to-face communication with a middle school student who had not signed an enrollment contract. When Coach Joe Marley wanted his middle school son to lift weights with the Brentwood Academy football team, where face-to-face communication with both coaches and students would clearly occur routinely, Ronnie Carter told Carlton Flatt to just get a letter (Plaintiff's Exhibit 7) from the father indicating his intent to send the student to Brentwood Academy and it would be permissible.

**15.** Defendants argued at closing argument that this case should not be in federal court and that only the lawyers will benefit from it. The United States Supreme Court found this case belongs in federal court when it found

the TSSAA to be a state actor. *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). It is one of the roles of federal courts to interpret the First and Fourteenth Amendments and prevent unconstitutional state action. The TSSAA, as a state actor, controls more than 82,000 students and 370 schools which participate in TSSAA-governed sports. The TSSAA is not, and should not be, beyond judicial review.

**16.** The Recruiting Rule was enacted by the TSSAA commencing in the 1930's (Plaintiff's Exhibits 74–77 and 61–62) and ultimately enforced by the Board of Control, not Defendant Ronnie Carter (Plaintiff's Exhibit 88). Accordingly, any First Amendment "as applied"

### B. Substantive Due Process

The TSSAA also found that Brentwood Academy violated the Recruiting Rule because "[s]tudent-athletes have been admitted free of charge to athletic contests." (Plaintiff's Exhibit 88). The Recruiting Rule does not expressly prohibit "free admission" to games. The violation is based on Question 4, Example 7 of the interpretive commentary:

> Admitting students to athletic contests free of charge where there is an admission being charged at the contest except where there is a definite feeder pattern involved with the school.

(Plaintiff's Exhibits 63, 86 and 87).

For the reasons stated herein, the Court finds as a matter of fact, and concludes as a matter of law, that the Recruiting Rule, including the interpretive commentary, violates substantive due process as applied to Brentwood Academy regarding the complimentary tickets at issue here.

The U.S. Supreme Court has held that the Fourteenth Amendment guarantees more than fair process; it also covers a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them. *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 1713, 140 L.Ed.2d 1043 (1998). The touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective. *Id.* at 1716. "Since the time of our early explanations of due process, we have understood the core of the concept to be protection against arbitrary action." *Id.*[17]

In *Collins v. Harker Heights*, the Supreme Court noted that the Due Process Clause was intended to prevent government officials from abusing their power or employing it as an instrument of oppression. *Collins*, 503 U.S. 115, 112 S.Ct. 1061, 1069, 117 L.Ed.2d 261 (1992). Historically, this guarantee of due process has been applied to deliberate decisions of government officials to deprive a person of life, liberty or property. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986).[18] The asserted denial of due process is to be tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness may, in other circumstances, and in the light of other considerations, fall short of such denial. *Lewis*, 118 S.Ct. at 1719.

The Sixth Circuit Court of Appeals has stated that substantive due process is a "doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir.1992). Liability will attach to conduct intended to injure which is in some way unjustifiable by any governmental interest. *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (2002) (citing *Lewis*).

claim against Defendant Carter, individually, is dismissed.

**17.** History reflects the traditional and common sense notion that, like its forebearer in the Magna Carta, the Due Process Clause was intended to secure the individual from the arbitrary exercise of the powers of government. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986).

**18.** For example, the Court explicitly observed that citizens have a substantive due process right not to be subjected to arbitrary and irrational zoning decisions. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977).

■ Along with establishing a protected property or liberty interest, a plaintiff must demonstrate that it was the victim of a governmental action that was arbitrary, irrational, or tainted by improper motive in order to show a substantive due process violation. *Woodwind Estates, Ltd. v. Gretkowski,* 205 F.3d 118, 124 (3d Cir.2000). Evidence that the government acted improperly for reasons unrelated to the merits of its decision may support a finding that the government arbitrarily or irrationally abused its power in violation of substantive due process. *Id.* In disputed factual situations, the determination of the existence of improper motive or bad faith is properly made by the finder of fact. *Id.*

Substantive due process serves as a vehicle to limit various aspects of potentially oppressive government action, *Valot v. Southeast Local School District Bd. of Educ.,* 107 F.3d 1220, 1228 (6th Cir.1997), and involves the right not to be subject to arbitrary or capricious action by a state either by legislative or administrative action. *Buckeye Community Hope Foundation v. City of Cuyahoga Falls,* 263 F.3d 627, 641 (6th Cir.2001).[19]

A substantive due process analysis must begin with a careful description of the asserted property or liberty right. *Washington v. Glucksberg,* 521 U.S. 702, 117 S.Ct. 2258, 2268, 138 L.Ed.2d 772 (1997); *Reno v. Flores,* 507 U.S. 292, 113 S.Ct. 1439,1447, 123 L.Ed.2d 1 (1993).

■ The Court finds as a matter of fact, and concludes as a matter of law, that Brentwood Academy had a property interest, at a minimum, in the three thousand dollar ($3,000) fine assessed against it by the TSSAA (Plaintiff's Exhibit 88). *See,*

*e.g., Contractors Against Unfair Taxation Instituted on New Yorkers v. City of New York,* 1994 WL 455553 (S.D.N.Y. Aug.19, 1994) (property interest in money allegedly exacted for payment of fines for traffic violations); *Jones v. Cowley,* 948 F.2d 1294 (10th Cir.1991) ("Certainly, there is no doubt that the $15 fine is a deprivation of a property interest."); *Murray v. Dosal,* 150 F.3d 814 (8th Cir.1998) (inmate has property interest in money received from outside sources). Brentwood Academy also had a property interest in the post-season basketball tournament revenue that it would have received but for the suspension imposed by the TSSAA. *Id.* Ronnie Carter and Carlton Flatt both testified that all TSSAA basketball teams are tournament eligible and receive certain minimum revenue.

Brentwood Academy was deprived of its property interests immediately upon issuance of the July 29, 1997 letter (Plaintiff's Exhibit 88) from the TSSAA since the penalties were effective immediately.

In this case, the credible evidence at trial established that Kevin Armstrong, an assistant football coach at Neely's Bend Middle School, called Carlton Flatt for complimentary tickets to a Brentwood Academy football game. Armstrong and Flatt had never met or spoken. The Court credits the testimony of Flatt and Armstrong[20] that, at the time these tickets were discussed and used, Armstrong had never mentioned any prospective student athletes to Flatt. Armstrong told Flatt that he intended to take his adult girlfriend and her adult sister to the game. Flatt, in accordance with prior policy, arranged for tickets to be available in Arm-

**19.** For example, the Sixth Circuit has acknowledged a cognizable substantive due process claim where plaintiffs alleged damages caused by an irrational municipal agency action. *Oakwood Homeowners Ass'n at Stone-* *cliffe v. City of Mackinac Island,* 2000 WL 1434708 at *2 (Sept. 20, 2000).

**20.** Flatt and Armstrong are the only witnesses with personal knowledge of telephone calls between them.

strong's name at a "will call" ticket window. Flatt specifically told Armstrong that the tickets could be used by only adults, not by students.

Armstrong's intended adult guests ultimately were unable to attend the game. Armstrong testified that at the suggestion of the head football coach at Neely's Bend, Armstrong decided to take three student football players (Jesse Kellogg, Glean Eddy, and Courtney Hale) to the Brentwood Academy game as a reward for a good season. Because Eddy was an "at-risk" student, Armstrong had been designated his "mentor" by the principal of Neely's Bend and was "like a father" to him. It is undisputed that Armstrong never informed Carlton Flatt, or anyone at Brentwood Academy, that Armstrong intended to or did use the complimentary tickets for two students in contravention of Flatt's express instructions.

Armstrong took the three football players to the game. Armstrong made Eddy pay for his own ticket, with Eddy's own money, because Eddy had an interest in maybe attending Brentwood Academy. Armstrong identified himself at the "will call" ticket window and obtained the three complimentary tickets previously put there in his name.[21] Armstrong, without informing anyone at Brentwood Academy, used one ticket for himself and the other two tickets for Kellogg and Hale to be admitted to the game. Brentwood Academy charged five dollars ($5.00) admission to the game. Armstrong and the students sat in bleacher seats with other spectators. Neither Armstrong, nor any of the students, spoke to Carlton Flatt or any other Brentwood Academy coach.

As an initial matter, the Court finds that Brentwood Academy did not violate the express language of Question 4, Example 7 of the interpretive commentary to the Recruiting Rule.[22] Carlton Flatt gave complimentary tickets to another coach, not to students, as a professional courtesy. Armstrong gave the tickets to the students, without any knowledge of Brentwood Academy, after being expressly told that the tickets could be used only by adults.

The Court finds as a matter of fact, and concludes as a matter of law, that the Recruiting Rule, as applied to Brentwood Academy regarding the complimentary tickets, violates substantive due process.

As applied, the Recruiting Rule did not give Brentwood Academy constitutionally adequate notice that providing tickets to another coach, who secretly disregards express instructions to use the tickets only for adults, will constitute a violation. The Recruiting Rule is unconstitutionally vague as applied to Brentwood Academy on the facts of this case.

■ It is a basic principle of due process that a rule, regulation or law is void for vagueness if its prohibitions are not clearly defined. *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). The Recruiting Rule prohibition concerning free admission, as applied to Brentwood Academy under the facts presented at trial, is not clearly defined. As noted by the Sixth Circuit in this case,[23] the *Grayned* opinion states that

---

**21.** The tickets were not given to the "wrong" person or to middle school students at the ticket window.

**22.** Carter testified that the problem with the complimentary tickets was "singling out" the students. Brentwood Academy did not single these students out; Armstrong did.

**23.** The Sixth Circuit specifically cited *Grayned* with regard to the First Amendment facial challenge. 262 F.3d 543, 555. Nonetheless, the principles concerning due process are also on point with regard to the Recruiting Rule "as applied" to Brentwood Academy.

"because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.* at 2298–99. Here, the Recruiting Rule did not give a person of ordinary intelligence, specifically Brentwood Academy, a reasonable opportunity to know what was prohibited with regard to complimentary tickets so that it could act accordingly. Specifically, as noted above, Brentwood Academy was not adequately advised that providing complimentary tickets to a middle school football coach, with expressed instructions that they be used for adults only, could result unwittingly in a penalty against Brentwood Academy. Neither did the Recruiting Rule advise Brentwood Academy that specific monitoring procedures may be required at the ticket booths and gates.

*Grayned* also states that vague laws may trap the innocent by not providing fair warning. *Id.* at 2299. Under the facts of this case, the Recruiting Rule failed to provide fair warning that Brentwood Academy could be punished for the acts of a middle school football coach who, unbeknownst to Brentwood Academy, gave the complimentary tickets to students, even though he had been specifically told to use the tickets for adults only. In addition, the Recruiting Rule failed to provide fair warning to Brentwood Academy that, as applied to them, the Recruiting Rule required specific monitoring procedures at the ticket windows and gates in order to avoid being punished for a violation by a non-Brentwood Academy person.[24]

Finally, *Grayned* holds that in order to avoid arbitrary and discriminatory enforcement, laws must provide explicit standards for those who apply them—in this case, Ronnie Carter and the TSSAA Board of Control. "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* Here, there are no explicit standards; rather, Brentwood Academy was held strictly liable for all tickets to its game, regardless of who actually provided them to students. Brentwood Academy could not predict how the rule would be interpreted and applied to it.

Furthermore, the Court finds, as a matter of fact, and concludes as a matter of law, that the TSSAA Bylaws provide no explicit standards as to the penalties to be imposed for Recruiting Rule violations. Ronnie Carter, TSSAA Executive Director, testified that the penalty section was taken out of the Recruiting Rule and penalties rest in the sound discretion of the Executive Director. The Bylaws provide specific penalties for some violations—*e.g.*, Article II, Sections 10 and 32; Article III, Sections 5, 6 and 8—but no specific penalties or standards for punishing violations of the Recruiting Rule.

Question 2 following the Recruiting Rule states, in response to an inquiry about penalties for violations, that violation of the Recruiting Rule "shall cause the student to be ineligible at the school in violation, and a penalty shall be placed against the school." It does not say how long the student is ineligible or what range of or specific penalties may be imposed upon a school. As applied to Brentwood Academy, the students were not held to be ineli-

---

24. The evidence at trial was that the TSSAA does not have any specific procedural requirements or protocols for complimentary tickets or admissions. In any event, neither the Re-

cruiting Rule, nor the Bylaws, gave Brentwood Academy fair warning or notice of any required "institutional control" for complimentary tickets or admissions.

gible and the penalty, undefined and unlimited in the rule, included a $3,000 fine, "probation" for four years, and suspension of the football and men's basketball teams from the TSSAA playoff series for two years. (Plaintiff's Exhibit 88).

Although specific fines are imposed for certain other violations, *see, e.g.,* Article III, Sections 5, 6, and 8, which specify a $25.00 fine for violation of those sections, no ranges or guidelines are provided in the TSSAA Bylaws for determining a fine for a Recruiting Rule violation. Carter testified that he must have "just cause" to fine a school, but there is no definition of "just cause" in the rules and there are no standards by which to judge what amount of fine should be imposed. As applied to Brentwood Academy in this case, the Recruiting Rule gives no fair warning that the school could be assessed a $3,000 fine for a violation. No specific fine in the TSSAA Bylaws exceeds $25. Brentwood Academy had inadequate notice of the range of fines which could be imposed in the unfettered discretion of the Executive Director or Board of Control.

Moreover, "probation" is never even mentioned in the TSSAA Bylaws, much less identified as an available penalty. It is, in fact, unclear as applied to Brentwood Academy in this case, what "probation" means. Carter testified at trial that probation did not mean anything as a punishment except maybe a "heightened awareness." At best, heightened awareness would also mean heightened vulnerability of Brentwood Academy. Probation has to mean something or it would not have been imposed on Brentwood Academy by the TSSAA.[25] Brentwood Academy had no fair warning or notice from the Bylaws of

what exactly would be required of it during its probationary period or how probation would, in fact, work. For these reasons, applying a penalty of "probation" to Brentwood Academy in this case was arbitrary.

The Court also finds that the Recruiting Rule, as applied to Brentwood Academy, violated substantive due process because it gives no notice that strict liability will be imposed without regard to scienter. Likewise, the Recruiting Rule does not give constitutionally adequate notice that strict liability will be imposed even when a school has no knowledge of the facts upon which the violation is based. Again, the Recruiting Rule is unconstitutionally vague as applied to Brentwood Academy due to this lack of notice.

The history of the application of the "free admission" example in the interpretive commentary of the Recruiting Rule does not clarify the Recruiting Rule. Brentwood Academy had no access to prior precedent or knowledge about prior TSSAA rulings. Moreover, the credible evidence at trial showed that the Recruiting Rule has been inconsistently applied. For instance, the TSSAA found no violation against Father Ryan High School in a substantially similar instance of free admission. (Plaintiff's Exhibit 127).

In addition, Bernard Childress and Gene Menees, Assistant Executive Directors of the TSSAA, testified that the principals of two schools can simply agree to grant students free admission to games notwithstanding Question 4, Example 7 of the interpretive commentary of the Recruiting Rule. The history of arbitrary and selective enforcement of the Recruiting Rule

---

**25.** The August 23, 1977 letter (Plaintiff's Exhibit 88) imposes on Brentwood Academy, as the first penalty, "The entire athletic program of Brentwood Academy will be on probation for four years. If there are further violations

during the probationary period, TSSAA will have no choice but to take further disciplinary action." *See also* Plaintiff's Exhibits 86 and 87.

makes the Recruiting Rule more, rather than less, vague as applied in this case.[26]

Several defense witnesses testified that the remedy for any questions about the Recruiting Rule is to "just pick up the telephone" and call Ronnie Carter of the TSSAA. Constitutional rights, however, do not pivot on telephone calls. In addition, Ronnie Carter testified that any advice that he gives by telephone is non-binding on the TSSAA or him and cannot be relied upon as a defense to a violation of the Recruiting Rule.

For the reasons described above, the Court finds that the Recruiting Rule as applied to Brentwood Academy in this case violates the substantive due process guarantee of the Fourteenth Amendment. Judgment shall enter for Brentwood Academy against the TSSAA on the Fourteenth Amendment substantive due process "as applied" claim regarding the complimentary tickets.[27]

### C. Procedural Due Process

 The Court finds as a matter of fact, and concludes as a matter of law, that the TSSAA Board of Control considered *ex parte*, post-hearing evidence during its private deliberations, to which Brentwood Academy had no right of reply, in violation of the procedural due process rights of Brentwood Academy.

As discussed above, after the final hearing, the Board of Control deliberated in private, outside the presence of Brentwood Academy. During the private deliberations, the Board of Control received, considered, and relied upon *ex parte* statements and documentary evidence from Defendant Carter and two TSSAA employees who investigated the allegations against Brentwood Academy: Gene Menees and Bernard Childress. Brentwood Academy had no opportunity to reply to this *ex parte* evidence or even hear it and was prejudiced by the evidence and the private post-hearing process.

Bernard Childress and Gene Menees, Assistant Executive Directors of the TSSAA, participated in the investigation of the alleged violations, and the details of their investigation were not disclosed to Brentwood Academy prior to the final hearing. Mr. Childress testified that at the direction of Ronnie Carter, he interviewed Jacques Curry and others at East Middle School about Bart King allegedly recruiting Curry and others to attend Brentwood Academy. Childress also talked to coaches at Cameron and Goodlettsville Middle Schools about alleged recruiting of students by John Patton and King. Curry told Childress that he was recruited by several other private schools. Childress never talked to Bart King or John Patton or investigated the other schools.

Childress testified that, at the first appeal, Brentwood Academy asked to cross-examine Childress, but Ronnie Carter refused by stating that the hearing was a meeting of "school people" about "school issues" and not a court.

Childress further testified that during the private deliberations after the final hearing, the Board of Control members asked Childress questions and he answered the questions. Childress was "sure" that questions were asked by the Board of Control and that Childress an-

---

**26.** The lack of notice and history of selective enforcement also "tilts" the "level playing field," contrary to the TSSAA's stated governmental interest in competitive equity.

**27.** For the reasons stated previously regarding the First Amendment "as applied" claim, the Fourteenth Amendment substantive due process "as applied" claim, regarding the complimentary tickets, against Defendant Carter, individually, is dismissed.

swered the questions during the private deliberations. Finally, Childress testified that Carter informed the Board of Control at the final appeal hearing that "everything was open" and that the Board of Control was not bound by Carter's previous decisions or penalties.

Menees[28] testified that he interviewed coaches at Neely's Bend Middle School, which is not a member of the TSSAA, and student Jesse Kellogg. Menees said he never talked to Bart King because "we are school people dealing with school people." Menees testified that during the private deliberations of the Board of Control he did not answer questions, but he does not contest that the Board of Control had copies of his investigative notes at or before the deliberations. He stated that there is animosity between public and private schools in the TSSAA regarding athletics.

Carter testified that during the private deliberations after the final hearing, Carter, Menees and Childress were all present to answer questions from the Board of Control. Carter does not "recall" any questions that were asked and answered or many of the key events in question. Carter testified that the hearings are not a "burden of proof setting" but instead are where "school people" decide how to solve "school problems." He testified that he informed the Board of Control that his decision was "wiped out" and that the decision by the Board of Control was to be "totally new." Carter testified at trial that he was aware during the appeals that courts previously had held that the TSSAA is a state actor.

On the other hand, Board of Control member Mike Hammond testified that the Board of Control, in its private deliberations, considered evidence presented by Menees and Childress and that Carter advised and answered questions. Mickey Dunn, also a Board of Control member, stated that Childress discussed his interviews of witnesses and that Carter and Childress answered questions during the private deliberations. Board of Control member Morris Rogers testified that Carter, Menees and Childress all answered questions posed by the Board of Control during its private deliberations. Finally, Board of Control President Mike Reed testified that Childress and Menees provided information, including the results of witness interviews, to the Board of Control during the private deliberations. Bart King, according to Reed, was discussed and King was a factor in the penalties imposed.[29] The Court credits this evidence based on the demeanor of the witnesses, the consistency of the testimony, and because the testimony is adverse to the witnesses' interests as TSSAA Board of Control members.

Finally, Tom Nebel, an attorney for Brentwood Academy during the administrative appeals, testified that Brentwood Academy did not hear the evidence presented in the private post-hearing deliberations. Nebel further testified that Brentwood Academy had not seen Gene Menees' notes or Bernard Childress' notes before the final appeal. (Plaintiff's Exhibits 93–96). He stated that Carter refused to tell Brentwood Academy who was "singling

28. Menees' sister is Ronnie Carter's assistant and his brother-in-law was a coach at Hunters Lane High School for which Neely's Bend is a feeder school.

29. There was no indication from the TSSAA before the final hearing, however, that the organization was still considering the Bart King allegations. (*See, e.g.,* August 14, 1997

letter from Carter to Brown (Plaintiff's Exhibit 87); Carter testimony; Defendant's Answer at ¶ 70 (Docket No. 8)). Thus, the TSSAA and Carter misled Brentwood Academy about a person and allegation which ultimately mattered to the decision. Brentwood Academy was denied an opportunity to defend this allegation head on.

out" students for athletic purposes, and Brentwood Academy did not know what evidence Carter's decision was based upon. Carter admitted at trial that he never told Brentwood Academy the names of its accusers. According to Nebel, Carter advised him that Brentwood Academy had the burden of proof during the appeals. Nebel advised the Board of Control at the final hearing that Bart King was present to testify if the Board of Control wanted King's testimony. The transcript reveals that Carter answered "no," and King did not testify at the hearing. (Transcript of Proceedings on August 23, 1997 before the TSSAA Board of Control, at 90–91 (Plaintiff's Exhibit 134)).

As discussed previously, for purposes of due process, Brentwood Academy had a property interest in the three thousand dollar ($3,000) fine levied against it by the TSSAA, as well as certain post-season tournament revenues. Therefore, the TSSAA was required to comply with procedural due process before depriving Brentwood Academy of that property interest.

Brentwood Academy was deprived of its property interests immediately upon issuance of the July 29, 1997 letter (Plaintiff's Exhibit 88) from the TSSAA since the penalties were effective immediately. The two appeals by Brentwood Academy of the July 29, 1997 penalties were, therefore, post-deprivation hearings for purposes of the Fourteenth Amendment due process.

Defendants contend that procedural due process, in this context, only required the "right-of-reply" type of hearing discussed in pre-deprivation cases. *See Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). As the penalties imposed in this case took effect, depriving Brentwood Academy of its property interests, immediately upon issuance of the July 29, 1997 letter from the TSSAA, however, the

Court is not persuaded that the final hearing before the Board of Control was a "pre-deprivation" hearing. Consequently, the "right-of-reply" line of cases is not necessarily applicable here.

Even if those cases were applicable, however, a meaningful right-of-reply hearing is impossible if the plaintiff is not informed of the evidence considered by the decision-maker. *See, e.g., Loudermill,* 105 S.Ct. at 1495 ("The tenured public employee is entitled to oral or written notice of the charges against him, *an explanation of the employer's evidence,* and an opportunity to present his side of the story." (emphasis added)); *Moore v. Board of Education of the Johnson City Schools,* 134 F.3d 781, 785–86 (6th Cir.1998)("[The plaintiff] received written notice of the charges against her, *as well as an explanation of the Board's evidence,* and was offered an opportunity to present her side of the story." (emphasis added)); *Duchesne v. Williams,* 849 F.2d 1004, 1005 (6th Cir.1988)(Plaintiff permitted to cross examine employer's witnesses at pretermination hearing).

■ With exceptions not applicable here, "[e]x parte presentation of evidence denies due process..." *Swank v. Smart,* 898 F.2d 1247, 1253 (7th Cir.1990) (citing *Greene v. McElroy,* 360 U.S. 474, 496–97, 79 S.Ct. 1400, 1413–14, 3 L.Ed.2d 1377 (1959)). "[A] fair hearing includes the right to be shown the evidence on which the tribunal has relied ... including evidence pertaining to the gravity of the sanction to be imposed when liability is conceded." *Swank,* 898 F.2d at 1256 (citations omitted). *See also Newsome v. Batavia Local School District,* 842 F.2d 920, 927–28 (6th Cir.1988)(advising the decision-maker of evidence during closed deliberation session deprived plaintiff opportunity to rebut the evidence and "amounted to a clear deprivation of his

right to procedural due process of law."); *Fraternal Order of Police v. Tucker*, 868 F.2d 74, 80 (3rd Cir.1989)(*Loudermill* requires a meaningful pre-termination hearing which must include "a sufficient explanation of the employer's evidence to permit a meaningful response."); *American–Arab Anti–Discrimination Committee v. Reno*, 70 F.3d 1045, 1069 (9th Cir. 1995) ("...the very foundation of the adversary process assumes that use of undisclosed information will violate due process because of the risk of error.").

■ The Court also is not persuaded by the Defendants' contention that the type of hearing in this case, among "school people about school issues" is deserving of less process than that involved in the cases cited above. In *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976), the Supreme Court devised a policy-oriented analysis that balances three competing factors in determining whether proposed procedural safeguards should be required: (1) the private interest that will be affected by the official action; (2) the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the fiscal and administrative burden that the additional or substitute procedural requirements would entail.

Applying *Mathews* here, the Court concludes that requiring the TSSAA to present its evidence of a rules violation in the presence of the school alleged to have committed the violation is a fundamental procedural safeguard that would have imposed no, or a very modest, additional administrative burden on the organization, and would have "contributed substantially to the making of a rational decision..."

*Swank*, 898 F.2d at 1255. Moreover, it is clear that the *ex parte*, post-hearing evidence was unfairly prejudicial to Brentwood Academy. For instance, the President of the TSSAA, Mike Reed, testified that the *ex parte*, post-hearing evidence from Childress and Menees affected the overall penalty, especially the fine and probation. The missing procedural safeguards, therefore, had a high value and were necessary to protect the constitutional interests of Brentwood Academy.[30]

For the reasons described above, the Court concludes that the Defendants violated Brentwood Academy's right to procedural due process under the Fourteenth Amendment, and judgment shall enter for Brentwood Academy on that claim.

Given the above finding that the TSSAA and Ronnie Carter have violated Brentwood Academy's procedural due process rights, the Court does not reach the other alleged procedural due process violations asserted by Brentwood Academy.

### D. *Qualified Immunity*

Defendant Ronnie Carter has asserted a qualified immunity defense for the claims against him individually. Carter testified that he was personally aware that courts had previously held that the TSSAA is a state actor for purposes of 42 U.S.C. § 1983. Carter actively participated in and helped manage the hearing process. Carter also provided *ex parte* information to the Board of Control during its private deliberations by answering questions posed by members of the Board of Control.

■ The Court finds that Defendant Carter, as an employee of a private athlet-

---

**30.** In addition, Carter testified that after the final appeal hearing, a school can ask to appear before the Board of Control again. Nothing in the TSSAA's Bylaws provides for such a right, and Brentwood Academy had no fair notice in the Bylaws of the availability of such a procedure. In any event, Brentwood Academy has exhausted any required administrative remedies.

ic association, is not entitled to qualified immunity from suit by Brentwood Academy charging a violation of 42 U.S.C. § 1983 and the Constitution. Judicial history does not reveal a firmly rooted tradition of immunity applicable to employees of private athletic associations, and the purposes of the qualified immunity doctrine do not warrant immunity for employees of private athletic associations. *Richardson v. McKnight,* 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997).[31]

■ In any event, the Court finds that Defendant Carter is not entitled to qualified immunity on Brentwood Academy's procedural due process claim. When qualified immunity is asserted, the Court must conduct a two-step inquiry. The first step is to decide whether the Complaint alleges a violation of a constitutionally protected right. *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The Complaint in this case alleges a violation of a constitutionally protected right, procedural due process, for the reasons stated above. The second step is to ask whether the right was "clearly established" at the time of the violation. *Hinchman v. Moore,* 312 F.3d 198, 205 (6th Cir.2002). In this case, the contours of procedural due process were sufficiently clear and apparent that Carter had fair warning, and reasonably should have understood, that what he did violated the procedural due process rights of Brentwood Academy.

Carter testified that he was aware that the TSSAA had been declared a state actor subject to the Constitution prior to the hearing. For the reasons described previously regarding procedural due process, it was clearly established prior to this case that presentation and consideration of *ex parte,* post-hearing evidence violates procedural due process.[32] Carter acted objectively unreasonably in light of Brentwood Academy's clearly established right to procedural due process and, therefore, is not entitled to qualified immunity.

E. *Damages.*

■ Brentwood Academy seeks damages for the cost of repairing its reputation because it has been characterized wrongly as a "cheater" in the media. It also seeks compensation for the time that its employees have spent on matters arising from this litigation over the last five years. The damages claimed exceed six hundred thousand dollars ($600,000).

Carlton Flatt testified that he has spent between 300 to 400 hours on this case in the last five years. John Van Mol, an expert witness, stated that it would take a $350,000 media campaign to fix Brentwood Academy's reputation. Tom Seigenthaler, also an expert witness, estimated $292,000 in media damages. Mark McFerran, Director of External Affairs at Brentwood Academy, estimated that he has spent 900 hours on this matter and that his assistant, Leah Hoskins, has spent 620 hours on it.

---

31. The Court is not persuaded that Defendant Carter's reliance on the Sixth Circuit's decision in *Bartell v. Lohiser,* 215 F.3d 550 (6th Cir.2000) requires a different result. The *Lohiser* Court held that a private foster care contractor and private social workers who contracted with the state to provide a recommendation about whether a mother was fit to parent were entitled to qualified immunity. 215 F.3d at 555–57. The court concluded that the Defendants were private persons performing a discrete public service task at the express direction and under close supervision of the state. *Id.,* at 557. Carter has not made such a showing in this case.

32. In the event the Court of Appeals determines that qualified immunity could apply, this Court would find that Defendant Carter is entitled to qualified immunity on Brentwood Academy's First Amendment claim. Brentwood Academy's First Amendment rights regarding the TSSAA were not clearly established prior to this litigation.

McFerran also testified that Brentwood Academy has paid Steve Brumfield $115,000 of $159,000 owed for media consulting. Curtis Masters, who became Headmaster for Brentwood Academy in July, 2002, testified that the school's reputation has been harmed significantly by media reports. The harm has impacted image, admissions, alumni, new faculty, donations and all other aspects of the life of the school, according to Masters.

In order to recover damages under Section 1983, Brentwood Academy must prove, by a preponderance of the evidence, that the Defendants' actions or inactions proximately caused the injuries and damages sustained by Brentwood Academy. A proximate cause is a cause which, in natural and continuous sequence, produces the injury, and without which the injury would not have occurred. *See, e.g.,* T.P.I. 3—Civil 3.20. A wrongful act gives rise to no liability for damages unless it is the proximate cause of the injury of which Brentwood Academy complains. *Id.*

The Court finds that the damages claimed by Brentwood Academy were not proximately caused by Defendants TSSAA or Ronnie Carter.

The damage to Brentwood Academy's reputation was caused by non-party media reports. Neither the TSSAA nor Ronnie Carter controls the media.

The costs of employees working on matters arising from this litigation are the price of litigation that Brentwood Academy caused when it filed this case.

As discussed above, the Court has found that the Recruiting Rule, as applied to Brentwood Academy by the TSSAA, is unconstitutional in violation of the First Amendment and the Fourteenth Amendment to the Constitution. The Court also has found that Brentwood Academy's substantive and procedural due process rights under the Fourteenth Amendment were violated. The appropriate remedy for these violations of Brentwood Academy's constitutional rights is to enjoin the penalties imposed by the TSSAA. Accordingly, the August 23, 1997 penalties (Plaintiff's Exhibit 88) imposed by the TSSAA against Brentwood Academy are void and enjoined.[33]

### F. *Other Constitutional Claims.*

Brentwood Academy has alleged that the Recruiting Rule, "as written and as applied to Brentwood Academy, violates the equal protection guarantee under the Fourteenth Amendment." Joint Proposed Pre–Trial Order (Docket No. 279, p. 5); Amended Complaint (Docket No. 205, Count VII). The equal protection claim has not been addressed by the Court of Appeals because the claim was added by Amended Complaint after this case was remanded to this Court.

Brentwood Academy has also alleged that the Recruiting Rule "as written" violates the "substantive due process guaranteed under the Fourteenth Amendment." Joint Proposed Pretrial Order (Docket No. 279, p. 5); Complaint (Docket No. 1, Count II). It is unclear whether the Court of Appeals definitively ruled on this substantive due process "facial challenge" when it held that the Recruiting Rule did not violate the First Amendment on its face.[34]

---

**33.** The penalties imposed by the TSSAA on Brentwood Academy (Plaintiff's Exhibit 88) were not itemized by type of violation. All sanctions imposed, therefore, must be set aside to ensure that Brentwood Academy's constitutional rights are not infringed.

**34.** The Court finds that the TSSAA Executive Director, the Assistant Executive Director, and the Board of Control members gave inconsistent and contradictory testimony about how to interpret and apply the Recruiting Rule and the interpretive commentary. Compare the testimony of Mike Hammond, Mickey Dunn, Morris Rogers, Ronnie Carter, Mike Reed, Robert Baldridge, Bernard Childress and Gene Menees.

It is axiomatic that a Court should not rule upon constitutional questions unnecessarily. *See, e.g., Olympic Arms v. Buckles,* 301 F.3d 384, 388 (6th Cir.2002). Given the other rulings of this Court in favor of Brentwood Academy, it is unnecessary for the Court to reach the equal protection ("as written and as applied") and substantive due process ("as written") issues. Accordingly, the Court declines to make findings of fact or conclusions of law on these issues.

### G. *State Law Claim.*

Brentwood Academy has alleged that the TSSAA's conduct towards Brentwood Academy "violates Tennessee state law prohibiting unfair, unreasonable, arbitrary and oppressive action." Joint Proposed Pre–Trial Order (Docket No. 279, p. 5); Complaint (Docket No. 1, Count VI). The Tennessee law on "unfair, unreasonable, arbitrary and oppressive action" is not clearly developed. *See, e.g., Nashville St. Ry. v. Griffin,* 104 Tenn. 81, 57 S.W. 153 (1900); *Underground II, Inc. v. City of Knoxville,* 1998 WL 46447 (Tenn.Ct.App. Feb.4, 1998). Pursuant to 28 U.S.C. § 1367, the Court declines to exercise supplemental jurisdiction over the state law claim because it raises novel issues of state law. Accordingly, the Court does not make findings of fact or conclusions of law on this issue.

### III. *Summary*

For the reasons described above, the Court finds that judgment shall enter for Brentwood Academy against the TSSAA on the First Amendment "as applied" claim; the Fourteenth Amendment Substantive Due Process "as applied" claim; and the Fourteenth Amendment Procedural Due Process claim.

Judgment shall enter for Brentwood Academy against Ronnie Carter, individually, on the Fourteenth Amendment Procedural Due Process claim. Judgment shall enter for Ronnie Carter, individually, on the First Amendment "as applied" claim and the Fourteenth Amendment Substantive Due Process "as applied" claim.

It is unnecessary for the Court to reach the Fourteenth Amendment Equal Protection "as written and as applied" claim or the Substantive Due Process "as written" claim. The Court declines to take supplemental jurisdiction over the state law claim.

As relief for the above constitutional violations, the August 23, 1997 penalties (Plaintiff's Exhibit 88) imposed by the TSSAA against Brentwood Academy are declared void and enjoined.

The parties are again encouraged to amicably settle their differences. The parties shall advise the Court if they jointly want further Court-sponsored alternative dispute resolution.

IT IS SO ORDERED.