(Slip Opinion) OCTOBER TERM, 2006 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TENNESSEE SECONDARY SCHOOL ATHLETIC ASSOCIATION *v.* BRENTWOOD ACADEMY

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 06–427.   Argued April 18, 2007—Decided June 21, 2007

Petitioner association (TSSAA) regulates interscholastic sports among its members, Tennessee public and private high schools.  TSSAA sanctioned respondent (Brentwood), one of those private schools, because its football coach sent eighth-grade boys a letter that violated TSSAA's rule prohibiting members from using "undue influence" in recruiting middle school students for their athletic programs.  Following internal TSSAA review, Brentwood sued TSSAA and its executive director under 42 U. S. C. §1983, claiming, *inter alia,* that enforcement of the antirecruiting rule was state action violative of the First and Fourteenth Amendments and that TSSAA's flawed adjudication of its appeal deprived Brentwood of due process.  The District Court granted Brentwood relief, but the Sixth Circuit reversed, holding that TSSAA was a private voluntary association that did not act under color of state law.  This Court reversed that determination, *Brentwood Academy* v. *Tennessee Secondary School Athletic Assn.*, 531 U. S. 288, and the District Court again ruled for Brentwood on remand.  The Sixth Circuit affirmed, holding that the antirecruiting rule is a content-based regulation of speech that is not narrowly tailored to serve its permissible purposes and that the TSSAA board improperly considered *ex parte* evidence, thereby violating Brentwood's due process rights.

*Held:* The judgment is reversed, and the case is remanded.

442 F. 3d 410, reversed and remanded.

   JUSTICE STEVENS delivered the opinion of the Court with respect to Parts I, II–B, III, and IV, concluding:

   1. Enforcing a rule that prohibits high school coaches from recruit-

ing middle school athletes does not violate the First Amendment. Brentwood made a voluntary decision to join TSSAA and to abide by its antirecruiting rule. See 531 U. S., at 291. An athletic league's interest in enforcing its rules may warrant curtailing the speech of its voluntary participants. See, *e.g., Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563, 568. TSSAA does not have unbounded authority to condition membership on the relinquishment of constitutional rights, see *Garcetti* v. *Ceballos*, 547 U. S. ___, ___, and can impose only those conditions that are necessary to managing an efficient and effective state-sponsored high school athletic league. That necessity is obviously present here. No empirical data is needed to credit TSSAA's commonsense conclusion that hard-sell tactics directed at middle school students could lead to exploitation, distort competition between high school teams, and foster an environment in which athletics are prized more highly than academics. TSSAA's rule discourages precisely the sort of conduct that might lead to those harms, any one of which would detract from a high school sports league's ability to operate "efficiently and effectively." *Garcetti*, 547 U. S., at ___. Pp. 7–8.

2. TSSAA did not violate Brentwood's due process rights. The sanction decision was preceded by an investigation, several meetings, correspondence, the TSSAA executive director's adverse written determination, a hearing before the director and an advisory panel, and a *de novo* review by the entire TSSAA board. During the investigation, Brentwood was notified of all the charges against it. At each of the hearings, it was represented by counsel and given the opportunity to adduce evidence, none of which was excluded. The Court rejects Brentwood's argument that its due process rights were nevertheless violated when the full TSSAA board, acting *ex parte*, heard from investigators and other witnesses and considered the investigators' notes and other evidence concerning a separate incident in which a basketball coach named King, who was not a Brentwood employee, pushed a middle school basketball star to attend Brentwood. Even accepting the questionable holding that TSSAA's closed-door deliberations were unconstitutional, any due process violation was harmless beyond a reasonable doubt. It is unlikely the King allegations increased the severity of the penalties leveled against Brentwood. More importantly, Brentwood's prejudice claim rests on the unsupported premise that it would have adopted a different and more effective strategy at the board hearing had it been given an opportunity to cross-examine the investigators and review their notes. Brentwood has identified nothing the investigators shared with the Board that Brentwood did not already know. Pp. 8–12.

Syllabus

STEVENS, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–B, III, and IV, in which ROBERTS, C. J., and SCALIA, KENNEDY, SOUTER, GINSBURG, BREYER, and ALITO, JJ., joined, and an opinion with respect to Part II–A, in which SOUTER, GINSBURG, and BREYER, JJ., joined. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment, in which ROBERTS, C. J., and SCALIA, and ALITO, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

-------

No. 06–427

-------

## TENNESSEE SECONDARY SCHOOL ATHLETIC ASSOCIATION, PETITIONER *v.* BRENTWOOD ACADEMY

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 21, 2007]

JUSTICE STEVENS announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–B, III, and IV, and an opinion with respect to Part II–A, in which JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join.

The principal issue before us is whether the enforcement of a rule prohibiting high school coaches from recruiting middle school athletes violates the First Amendment. We also must decide whether the sanction imposed on respondent for violating that rule was preceded by a fair hearing.

I

Although this case has had a long history, the relevant facts may be stated briefly. The Tennessee Secondary School Athletic Association (TSSAA) is a not-for-profit membership corporation organized to regulate interscholastic sports among its members, which include some 290 public and 55 private high schools in Tennessee. Brentwood Academy is one of those private schools.

Since the early 1950's, TSSAA has prohibited high

schools from using "undue influence" in recruiting middle school students for their athletic programs. In April 1997, Brentwood's football coach sent a letter to a group of eighth-grade boys inviting them to attend spring practice sessions. See App. 119. The letter explained that football equipment would be distributed and that "getting involved as soon as possible would definitely be to your advantage." *Ibid.* It was signed "Your Coach." *Ibid.* While the boys who received the letter had signed a contract signaling their intent to attend Brentwood, none had enrolled within the meaning of TSSAA rules. See *id.,* at 182 (defining "enrolled" as having "attended 3 days of school"). All of the boys attended at least some of the spring practice sessions. As the case comes to us, it is settled that the coach's pre-enrollment solicitation violated the TSSAA's anti-recruiting rule and that he had ample notice that his conduct was prohibited.

TSSAA accordingly sanctioned Brentwood. After proceeding through two layers of internal TSSAA review, Brentwood brought this action against TSSAA and its executive director in federal court under 42 U. S. C. §1983. As relevant here, Brentwood made two claims: first, that enforcement of the rule was state action in violation of the First and Fourteenth Amendments; and second, that TSSAA's flawed adjudication of its appeal had deprived the school of due process of law. The District Court granted relief to Brentwood, but the Court of Appeals reversed, holding that TSSAA was a private voluntary association that did not act under color of state law. We granted certiorari and reversed, holding that the District Court was correct on the threshold issue. *Brentwood Academy* v. *Tennessee Secondary School Athletic Assn.*, 531 U. S. 288 (2001). On remand, the Sixth Circuit sent the case back to the District Court, which once again ruled for Brentwood. 304 F. Supp. 2d 981 (MD Tenn. 2003). TSSAA appealed, and the Court of Appeals affirmed over

one judge's dissent. 442 F. 3d 410 (2006). The majority held that the anti-recruiting rule is a content-based regulation of speech that is not narrowly tailored to serve its permissible purposes. *Id.,* at 420–431. It also concluded that the TSSAA Board improperly considered *ex parte* evidence during its deliberations, thereby violating Brentwood's due process rights. *Id.,* at 433–438.

We again granted certiorari, 549 U. S. ___ (2007), and we again reverse.

## II

The First Amendment protects Brentwood's right to publish truthful information about the school and its athletic programs. It likewise protects the school's right to try to persuade prospective students and their parents that its excellence in sports is a reason for enrolling. But Brentwood's speech rights are not absolute. It chose to join TSSAA, an athletic league and a state actor invested with a three-fold obligation to prevent the exploitation of children, to ensure that high school athletics remain secondary to academics, and to promote fair competition among its members. TSSAA submits that these interests adequately support the enforcement against its member schools of a rule prohibiting coaches from trying to recruit impressionable middle school athletes. Brentwood disagrees, and maintains that TSSAA's asserted interests are too flimsy and its rule too broad to support what the school views as a serious curtailment of its constitutional rights. Two aspects of the case taken together persuade us that TSSAA should prevail.

### A

The anti-recruiting rule strikes nowhere near the heart of the First Amendment. TSSAA has not banned the dissemination of truthful information relating to sports, nor has it claimed that it could. Cf. *Virginia Bd. of Phar-*

*macy* v. *Virginia Citizens Consumer Council, Inc.*, 425
U. S. 748 (1976) (striking down a prohibition on advertis-
ing prices for prescription drugs). It has only prevented
its member schools' coaches from recruiting individual
middle school students. Our cases teach that there is a
difference of constitutional dimension between rules pro-
hibiting appeals to the public at large, see *44 Liquormart,
Inc.* v. *Rhode Island*, 517 U. S. 484, 495–500 (1996), and
rules prohibiting direct, personalized communication in a
coercive setting.

*Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978),
nicely illustrates the point. In *Ohralik*, we considered
whether the First Amendment disabled a state bar associa-
tion from disciplining a lawyer for the in-person solicita-
tion of clients. The lawyer argued that under our decision
in *Bates* v. *State Bar of Ariz.*, 433 U. S. 350, 384 (1977),
which invalidated on First Amendment grounds a ban on
truthful advertising relating to the "availability and terms
of routine legal services," his solicitation was protected
speech. We rejected the lawyer's argument, holding that
the "in-person solicitation of professional employment by a
lawyer does not stand on a par with truthful advertising
about the availability and terms of routine legal services,
let alone with forms of speech more traditionally within
the concern of the First Amendment." 436 U. S., at 455.
We reasoned that the solicitation ban was more akin to a
conduct regulation than a speech restriction:

> "'[I]t has never been deemed an abridgment of free-
> dom of speech or press to make a course of conduct il-
> legal merely because the conduct was in part initi-
> ated, evidenced, or carried out by means of language,
> either spoken, written, or printed.' Numerous exam-
> ples could be cited of communications that are regu-
> lated without offending the First Amendment, such as
> the exchange of information about securities, corpo-

rate proxy statements, the exchange of price and production information among competitors, and employers' threats of retaliation for the labor activities of employees . . . . Each of these examples illustrates that the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Id.*, at 456 (citations omitted).

Drawing on these examples, we found that the "[i]n-person solicitation by a lawyer of remunerative employment is a business transaction in which speech is an essential but subordinate component," *id.*, at 457, the prohibition of which raised few (if any) First Amendment problems.

*Ohralik* identified several evils associated with direct solicitation distinct from the harms presented by conventional commercial speech. Direct solicitation "may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection," *ibid.;* its goal "may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decisionmaking," *ibid.;* and it short circuits the "opportunity for intervention or counter-education by agencies of the Bar, supervisory authorities, or persons close to the solicited individual," *ibid.* For these reasons, we concluded that in-person solicitation "actually may disserve the individual and societal interest, identified in *Bates*, in facilitating 'informed and reliable decisionmaking.'" *Id.,* at 458 (quoting *Bates*, 433 U. S., at 364).

We have since emphasized that *Ohralik*'s "narrow" holding is limited to conduct that is "'inherently conducive to overreaching and other forms of misconduct.'" *Edenfield* v. *Fane*, 507 U. S. 761, 774 (1993) (quoting *Ohralik*, 436 U. S., at 464); see also *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626, 641 (1985) (emphasizing that *Ohralik* involved a "practice rife

with possibilities for overreaching, invasion of privacy, the exercise of undue influence, and outright fraud"). And we have not been chary of invalidating state restrictions on solicitation and commercial advertising in the absence of the acute risks associated with in-person legal solicitation. See *Edenfield*, 507 U. S., at 775 (striking down a restriction on in-person solicitation by accountants because such solicitation "poses none of the same dangers" identified in *Ohralik*); *Zauderer*, 471 U. S., at 639–647 (invalidating a restriction on truthful, nondeceptive legal advertising directed at people with specific legal problems); *Shapero* v. *Kentucky Bar Assn.*, 486 U. S. 466, 472–478 (1988) (overturning a blanket proscription on all forms of legal solicitation). In our view, however, the dangers of undue influence and overreaching that exist when a lawyer chases an ambulance are also present when a high school coach contacts an eighth grader.

After all, it is a heady thing for an eighth-grade student to be contacted directly by a coach—here, "Your Coach"—and invited to join a high school sports team. In too many cases, the invitation will come accompanied with a suggestion, subtle or otherwise, that failure to accept will hurt the student's chances to play high school sports and diminish the odds that she could continue on to college or (dream of dreams) professional sports. Cf. App. 119 ("I do feel that getting involved as soon as possible would definitely be to your advantage").[1] Such a potent entreaty, playing as it does on youthful hopes and fears, could well exert the kind of undue pressure that "disserve[s] the individual and societal interest . . . in facilitating 'informed and reliable decisionmaking.'" *Ohralik*, 436 U. S., at 458. Given that TSSAA member schools remain free to

---

[1] When asked at trial about this language from the offending letter, the Brentwood football coach acknowledged that "[i]n some cases" the middle school student is "not going to think that's optional." App. 301.

send brochures, post billboards, and otherwise advertise their athletic programs, TSSAA's limited regulation of recruiting conduct poses no significant First Amendment concerns.

### B

Brentwood made a voluntary decision to join TSSAA and to abide by its antirecruiting rule. See *Brentwood*, 531 U. S., at 291 ("No school is forced to join"); cf. *Grove City College* v. *Bell*, 465 U. S. 555, 575 (1984). Just as the government's interest in running an effective workplace can in some circumstances outweigh employee speech rights, see *Connick* v. *Myers*, 461 U. S. 138 (1983), so too can an athletic league's interest in enforcing its rules sometimes warrant curtailing the speech of its voluntary participants. See *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563, 568 (1968) (holding that the scope of a government employee's First Amendment rights depends on the "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees"); see also *Board of Comm'rs, Wabaunsee Cty.* v. *Umbehr*, 518 U. S. 668, 679 (1996) ("eschew[ing]" a formal approach to determining which contractual relationships call for the application of *Pickering* balancing). This is not to say that TSSAA has unbounded authority to condition membership on the relinquishment of any and all constitutional rights. As we recently emphasized in the employment context, "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti* v. *Ceballos*, 547 U. S. ___, ___ (2006) (slip op., at 7). Assuming, without deciding, that the coach in this case was "speaking as

[a] citize[n] about matters of public concern," *ibid.*, TSSAA
can similarly impose only those conditions on such speech
that are necessary to managing an efficient and effective
state-sponsored high school athletic league.

That necessity is obviously present here. We need no
empirical data to credit TSSAA's common-sense conclusion
that hard-sell tactics directed at middle school students
could lead to exploitation, distort competition between
high school teams, and foster an environment in which
athletics are prized more highly than academics. See
*Paris Adult Theatre I* v. *Slaton*, 413 U. S. 49, 60 (1973).
TSSAA's rule discourages precisely the sort of conduct
that might lead to those harms, any one of which would
detract from a high school sports league's ability to oper-
ate "efficiently and effectively." *Garcetti*, 547 U. S., at ___
(slip op., at 7). For that reason, the First Amendment does
not excuse Brentwood from abiding by the same anti-
recruiting rule that governs the conduct of its sister
schools. To hold otherwise would undermine the principle,
succinctly articulated by the dissenting judge at the Court
of Appeals, that "[h]igh school football is a game. Games
have rules." 442 F. 3d, at 444 (opinion of Rogers, J.). It is
only fair that Brentwood follow them.

## III

The decision to sanction Brentwood for engaging in
prohibited recruiting was preceded by an investigation,
several meetings, exchanges of correspondence, see App.
120–123 (fax from Brentwood's coach to TSSAA's execu-
tive director), *id.,* at 124–127 (memorandum from director
to Brentwood's headmaster), *id.,* at 128–133 (letter from
the headmaster responding to the director's memoran-
dum), *id.,* at 204–211 (letter from TSSAA director to
headmaster with further questions); *id.,* at 212–229 (re-
sponsive letter from Brentwood's headmaster), an adverse
written determination from TSSAA's executive director,

*id.,* at 238–244, a hearing before the director and an advisory panel composed of three members of TSSAA's Board of Control, see *id.*, at 254–258, and finally a *de novo* review by the entire TSSAA Board of Directors, see *id.,* at 269–271. During the investigation, Brentwood was notified of all the charges against it. At each of the two hearings, Brentwood was represented by counsel and given the opportunity to adduce evidence. No evidence offered by Brentwood was excluded.

Brentwood nevertheless maintains that its due process rights were violated when the full TSSAA board, during its deliberations, heard from witnesses and considered evidence that the school had no opportunity to respond to. Some background is necessary to understand the claim. One of the matters under investigation was whether an Amateur Athletic Union basketball coach named Bart King had pushed talented middle school students— including a basketball star named Jacques Curry—to attend Brentwood. See, *e.g.*, *id.*, at 220, 222 (letter from Brentwood's headmaster discussing the allegation that King had told Curry that if he attended Brentwood, he "would *probably* have a car when he is in the tenth grade"). Brentwood consistently maintained that King had no affiliation with the school and no authority to act on its behalf. See, *e.g.*, *id.*, at 221–222. Nevertheless, the initial decision by TSSAA's executive director, as well as the subsequent decision by the director and the advisory panel, declared Curry (as well as several other players) ineligible to play for Brentwood. See *id.*, at 243 (blanket ineligibility), 255 (ineligibility for varsity sports).

As it had in earlier stages of the case, in Brentwood's final appeal to the TSSAA Board, the school offered live testimony from Curry and an affidavit from King denying the alleged recruiting violations. See *id.,* at 264–267 (Curry's testimony); *id.,* at 261 (listing "Affidavit of Bart

King" as an exhibit).[2]  Once Curry had testified, Brentwood's counsel advised the board that King was available to answer any questions, but did not call him as a witness.[3]  After reviewing the evidence, the board found that Brentwood had committed three specific violations of its rules, none of which appeared to involve either King or Curry, and it reinstated Curry's eligibility. *Id.,* at 269–271.  As a penalty for the three violations, the board put Brentwood's athletic program on probation for four years, excluded the boys' basketball and football teams from tournament playoffs for two years, and imposed a $3,000 fine. *Id.,* at 270.

During its deliberations, the board discussed the case with the executive director who had presided at the earlier

———————

[2] The District Court's conclusion that "[t]here was no indication from the TSSAA before the final hearing . . . that the organization was still considering the Bart King allegations" is clearly erroneous. 304 F. Supp. 2d 981, 1004, n. 29 (MD Tenn. 2003); see also 442 F. 3d 410, 435, and n. 20 (CA6 2006) (affirming finding).  Brentwood appealed to the full board in part to overturn the ineligibility sanction that had been leveled against Curry and several other players.  See App. 255. Because the only justification for declaring Curry ineligible was that King had improperly recruited him to play for Brentwood, the King allegations were obviously at issue.  Brentwood understood as much.  It otherwise would have been wasted effort for King to submit an affidavit and for Curry to testify.

Similarly, given that Curry testified in some detail about his relationship with King, *id.*, at 264–267, the Court of Appeals incorrectly concluded that the discussion of King was limited to a brief exchange about whether King would testify.  See 442 F. 3d, at 435 ("Evidently this was the only discussion of King at the hearing").

[3] "[Brentwood's lawyer]: Any other questions?  That's going to be it for our proof.  If I could make just a few concluding remarks.
"By the way, we have Bart King here to answer any questions.  And it was our intention to put him on, but I don't know if you all are interested in extending for five minutes to hear from Bart King or not.  He's here if you want him.
"[TSSAA's Executive Director]: No.
"[Brentwood's lawyer]: No.  All right."  App. 267.

proceedings and two TSSAA investigators, none of whom had been cross-examined. The investigators also provided handwritten notes to the board detailing their investigations; Brentwood never received those notes. The District Court found that the consideration of the *ex parte* evidence influenced the board's penalty decision and contravened the Due Process Clause. 304 F. Supp. 2d, at 1003–1006. The Court of Appeals accepted that finding, as well as the conclusion that the evidence tainted the fairness of the proceeding. 442 F. 3d, at 433–438. TSSAA now maintains that the lower courts erred.

We agree. Even accepting the questionable holding that TSSAA's closed-door deliberations were unconstitutional, we can safely conclude that any due process violation was harmless beyond a reasonable doubt. To begin with, it is hard to believe that the King allegations increased the severity of the penalties leveled against Brentwood.[4] But

––––––––––

[4] At trial, a board member testified that the board "dropped" the charges relating to King, *id.*, at 347 (testimony of Michael Hammond), which explains why the board restored Curry's eligibility. The fine, the probationary period, and the playoff suspension had all been imposed at earlier stages of the proceedings, see *id.*, at 243, 255, suggesting that the board was as a practical matter just affirming penalties associated with the remaining recruiting violations. The King allegations appear to have played a negligible role in choosing which penalties to assess.

The District Court drew its contrary conclusion from a single piece of evidence: the board president's affirmative response during a deposition to a question about whether the King allegations supported the board's finding that the recruiting rule had been violated. 442 F. 3d, at 435–436. As the board president clarified at trial, however, while the King allegations were a "'factor'" in the board's discussions, the "'final penalty did not involve Bart King . . . . [T]he final penalty really dealt with the letter from Mr. Flatt.'" *Id.,* at 436. Thinking it a close call, *ibid.* ("Whether the King issue was actually a factor in the penalties ultimately imposed is far less certain"), the Court of Appeals held that the District Court could credit the board president's deposition testimony over his subsequent qualification of that testimony. We agree with the dissenting judge below that "so slender an evidentiary reed" cannot support the conclusion that TSSAA violated Brentwood's proce-

more importantly, Brentwood's claim of prejudice rests on the unsupported premise that it would have adopted a different and more effective strategy at the board hearing had it been given an opportunity to cross-examine the investigators and review their notes. Despite having had nearly a decade since the hearing to undertake that cross-examination and review, Brentwood has identified nothing the investigators shared with the board that Brentwood did not already know.[5]  Perhaps that is why Brentwood never explains what a more effective strategy might have looked like.  Brentwood obliquely suggests it might have had King testify at the hearing, but it gives no inkling of what his testimony would have added to the proceedings. We are not inclined to speculate on its behalf.

## IV

We accordingly reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

---

dural rights.  *Id.*, at 454 (opinion of Rogers, J.).

[5] Nor has our independent review of the investigators' notes unearthed any allegation of misconduct that would have been new to Brentwood.  See XV App. in No. 03–5245 etc. (CA 2006), pp. 4178–4193.

# SUPREME COURT OF THE UNITED STATES

No. 06–427

TENNESSEE SECONDARY SCHOOL ATHLETIC ASSOCIATION, PETITIONER *v.* BRENTWOOD ACADEMY

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 21, 2007]

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE ALITO join, concurring in part and concurring in the judgment.

Although I have little difficulty concluding that the regulation at issue does not contravene the First Amendment, I do not agree with the principal opinion's reliance on *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978). *Ohralik*, as the principal opinion notes, involved communications between attorney and client, or, more to the point, the in-person solicitation by an attorney of an accident victim as a potential client. *Ohralik* was later extended to attorney solicitation of accident victims through direct mail, though the Court was closely divided as to the constitutionality of that extension. See *Florida Bar* v. *Went For It, Inc.*, 515 U. S. 618 (1995). But the Court has declined to extend the *Ohralik* rule beyond the attorney-client relationship.

In *Edenfield* v. *Fane*, 507 U. S. 761 (1993), the Court struck down a ban on solicitation from accountants to potential clients. The Court there made clear that *Ohralik* "did not hold that all personal solicitation is without First Amendment protection." 507 U. S., at 774. It further noted that "*Ohralik*'s holding was narrow and depended upon certain 'unique features of in-person solicitation by

lawyers' that were present in the circumstances of that case." *Ibid.* (quoting *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626, 641 (1985)).

In my view it is both unnecessary and ill advised to rely upon *Ohralik* in the instant matter. By doing so, the principal opinion, at a minimum, is open to the implication that the speech at issue is subject to state regulation whether or not the school has entered a voluntary contract with a state-sponsored association in order to promote a code of conduct affecting solicitation. To allow free-standing state regulation of speech by coaches and other representatives of nonmember schools would be a dramatic expansion of *Ohralik* to a whole new field of endeavor. Yet by relying on *Ohralik* the principal opinion undermines the argument that, in the absence of Brentwood Academy's consensual membership in the Tennessee Secondary School Athletic Association, the speech by the head coach would be entitled to First Amendment protection.

For these reasons I must decline to join Part II–A of the principal opinion and any other portion of Part II that suggests *Ohralik* is applicable here. It is evident, furthermore, that a majority of the Court agrees with this position. See *post*, at 2 (THOMAS, J., concurring in judgment). I do join the remainder of the Court's opinion and the judgment that ensues.

# SUPREME COURT OF THE UNITED STATES

_____

No. 06–427

_____

TENNESSEE SECONDARY SCHOOL ATHLETIC ASSOCIATION, PETITIONER *v.* BRENTWOOD ACADEMY

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 21, 2007]

JUSTICE THOMAS, concurring in the judgment.

In resolving this case, the Court applies the *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U. S. 563 (1968), line of cases to hold that the Tennessee Secondary School Athletic Association (TSSAA) did not violate Brentwood's First Amendment rights. *Ante*, at 7–8. Until today, *Pickering* governed limitations on the speech rights of government employees and contractors. The Court uproots *Pickering* from its context and applies it to speech by a private school that is a member of a private athletic association. The need to stretch *Pickering* to fit this case was occasioned by the Court when it held that TSSAA, a private organization, was a state actor. *Brentwood Academy* v. *Tennessee Secondary School Athletic Assn.*, 531 U. S. 288 (2001) *(Brentwood I)*. Because *Brentwood I* departed so dramatically from our earlier state-action cases, it is unsurprising that no First Amendment framework readily applies to this case. Rather than going through the bizarre exercise of extending obviously inapplicable First Amendment doctrine to these circumstances, I would simply overrule *Brentwood*

*I.\** See *id.*, at 305–315 (THOMAS, J., dissenting).

The Court's extension of *Pickering* to this context is therefore unnecessary, but the principal opinion's application of *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978), *ante*, at 4–6, is outright wrong. For the reasons expressed in JUSTICE KENNEDY's opinion concurring in part and concurring in the judgment, *ante*, at 1–2, *Ohralik* is a narrow rule addressed to a particular context that has no application to the facts of this case. For these reasons, I concur in the Court's judgment.

---

\*Holding that TSSAA is not a state actor would also resolve Brentwood's due process claim.